IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KIM DOAN and I.D., | : | CIVIL ACTION |
|       Plaintiffs | : | |
| | : | |
|   v. | : | No. 19-959 |
| | : | |
| DOWNINGTOWN AREA SCHOOL | : | |
| DISTRICT and LARRY MUSSOLINE, | : | |
|       Defendants | : | |

**<u>MEMORANDUM OF DECISION</u>**

THOMAS J. RUETER                              August 13, 2020
United States Magistrate Judge

        Presently before the court is the motion to dismiss plaintiffs' Amended Complaint ("Am. Compl.") for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) (the "Motion"; Doc. 14) filed by defendants Downingtown Area School District ("the District") and Larry Mussoline ("Mussoline"), and the response of plaintiffs, Kim Doan ("Doan") and I.D. ("Resp."; Doc. 15). The Honorable Juan R. Sánchez held oral argument on the Motion on October 9, 2019.[1] For the following reasons, the Motion will be **GRANTED** as to Counts I, III, and IV, and **DENIED** as to Count II.

## I.      Background

        Plaintiff Doan is the mother of I.D., who at all times relevant herein was, and still is, a minor child. (Am. Compl. ¶ 11.) Plaintiff I.D. is a twice-exceptional student, meaning that I.D. is a "gifted student" as that term is defined under Pennsylvania Law, 22 Pa. Cons. Stat. §

---

[1]     Plaintiff Kim Doan filed a complaint on March 6, 2019 (Doc. 1). Defendant filed a motion to dismiss, which was granted after a hearing before Chief Judge Sánchez. See Docs. 4-12. Plaintiffs then filed the Amended Complaint (Doc. 13) which is the subject of the instant motion to dismiss.

16.1 (2019), and a "child with a disability" under the Individuals with Disabilities Education Act, 20 U.S.C. § 1401(3). Id. ¶ 12.

On June 7, 2013, while I.D. was enrolled in Lionville Elementary and preparing for second grade for the 2013-2014 school year, I.D. received an initial Gifted Individualized Education Plan ("GIEP"). Id. ¶ 14. The GIEP identified I.D.'s special educational needs and provided I.D. with advanced math instruction using an individualized, computer-based model. Id. ¶ 16. I.D.'s GIEP was based upon a Gifted Multidisciplinary Evaluation conducted in May 2013. Id. ¶ 15. Plaintiff Doan alleges that over the course of I.D.'s second-grade year, I.D. showed deteriorating academic performance indicating that I.D. required a more social educational environment. Id. ¶ 17.

As a result, Doan requested a revision to the GIEP to properly effectuate these changes. Id. ¶ 18. The District granted Doan's request in mid-2014, when I.D. was between second and third grade. Id. Under the revised GIEP, a then-third-grader I.D. received math instruction in a fourth-grade math class for the entire 2014-2015 school year. Id. ¶ 20.

During the 2015-2016 school year, I.D. was enrolled in fourth grade at Lionville Elementary, and took fifth-grade math daily in a regular fifth-grade math classroom.[2] Id. ¶ 21. In April of 2016, the District contacted Doan and raised concerns about I.D.'s math programming for the 2016-2017 school year, as I.D. would be enrolled in fifth grade, but pursuant to the GIEP, I.D. would learn sixth-grade math in a sixth-grade math classroom. Id. ¶ 23. This presented an issue, as all sixth-grade students in the District are educated at one school, the Marsh Creek Sixth Grade Center. Id. ¶ 24. On May 18, 2016, based on Doan's

[2]   A "regular classroom" is defined as "[a] specific instructional grouping within the regular classroom environment." See 22 Pa. Cons. Stat. § 16.1.

conversations with the District about the logistics of I.D.'s math education for the 2016-2017

school year, the District offered a Notice of Recommended Educational Placement ("NOREP").

Id. ¶ 25.

Pursuant to the NOREP proposed for the 2016-2017 school year, I.D. would

receive sixth-grade math instruction using an online model during I.D.'s fifth-grade year, and

I.D. would remain at Lionville Elementary for these sessions.  Id. ¶ 26.  No new education

evaluation—which is required for gifted students before revision of a GIEP or IEP involving

gifted education—was conducted.  Id. ¶ 27.

Doan rejected the NOREP and requested a due process hearing.  Id. ¶ 29.

Specifically, Doan requested that I.D. receive sixth-grade math provided in a regular math

classroom, consistent with the GIEP and IEP.  Id. ¶ 30.  In her due process complaint, Doan

stated that the District should have been required to transport I.D. to the Marsh Creek Sixth

Grade Center for his math class.  Id. ¶ 31.  In the due process hearing, Hearing Officer Brian

Jason Ford agreed with Doan ("Hearing Officer decision").  Id. ¶ 32.  In his August 12, 2016

decision, Hearing Officer Ford held that the District's NOREP was "not appropriate," and that an

appropriate gifted math program for I.D. must include placement above grade level in a regular

classroom for that grade level.  Id.  The Hearing Officer held that while the District may exercise

its discretion as to the physical location of that classroom, it must transport I.D. to the Marsh

Creek Center if in fact that was the only option.  Id. ¶ 35.  The District appealed Hearing Officer

Ford's decision to the Pennsylvania Commonwealth Court.  Id. ¶ 37.  During the pendency of

that appeal, the District did not implement the Hearing Officer's order.  Id. ¶ 38.

The Pennsylvania Commonwealth Court affirmed the Hearing Officer's opinion

on March 6, 2017.  Id. ¶ 40; See Downingtown Area Sch. Dist. v. K.D., 2017 WL 877316 (Pa.

Cmwth. Mar. 6, 2017).  The court held that the NOREP was not appropriate.  Id. ¶ 42.  The court stated that the District must provide I.D. with normal sixth-grade classroom instruction.  Id. ¶ 43. The court said, "receiving math lessons in a separate room via one-on-one, independent and computer-based learning can hardly be said to qualify as a 'regular education classroom.'"[3]  Id. ¶ 45.  However, the District continued to use the computer-based plan for the remainder of I.D.'s fifth-grade year.  Id. ¶ 47.  Doan filed a contempt petition based upon the District's refusal to follow the order, however, the petition was not heard until after the school year had ended— rendering it moot.  Id. ¶ 49.

According to the Amended Complaint, I.D. now receives instruction that better accommodates his needs.  Id. ¶ 51.  However, Doan alleges that the District's failure to modify the NOREP during the entirety of I.D.'s fifth-grade year led to long-lasting harm for I.D.'s development.  Doan alleges damages based on I.D.'s social and educational setbacks, poor academic performance, and the need to hire a tutor.  Specifically, Doan challenges (1) the District's appeal of Hearing Officer Ford's decision, (2) the refusal to implement an appropriate plan during the Commonwealth Court appeal, and (3) the resistance to implementing an appropriate plan ever after the Commonwealth Court affirmed Hearing Officer Ford.

## II.   Applicable Law

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly,

---

[3]     A "regular education classroom" is defined as "[t]he regular classroom and other instructional settings in which students without a need for gifted education receive instructional programs and the full range of supportive services normally provided to these children."  See 22 Pa. Cons. Stat. § 16.1.

550 U.S. 544, 570 (2007)).  A district court first identifies those factual allegations that constitute nothing more than "legal conclusions" or "naked assertions."  Twombly, 550 U.S. at 555, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded.  Iqbal, 556 U.S. at 679.  The court then assesses "the 'nub' of the plaintiff['s] complaint—the well-pleaded, nonconclusory factual allegation[s]"—to determine whether it states a plausible claim for relief.  Id.

"[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile."  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008).  However, a court may dismiss a claim with prejudice based on "bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment."  Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993).

## III.        Discussion

Defendants argue that the Amended Complaint fails to allege any claims upon which relief can be granted, and seek dismissal under Rule 12(b)(6).  The court addresses each argument below.

### A.        Plaintiffs' Claims under 42 U.S.C. § 1983

In their Amended Complaint, in Counts I, II, and III, plaintiffs assert claims under § 1983 against the District.  42 U.S.C. § 1983 provides, in part, that

> [e]very person, who, under color of any statute, ordinance, regulation, custom, or usage, of a State or Territory ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

This statute does not create substantive rights; rather, it provides a remedy for violations of rights established elsewhere.  City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

To prevail on their claims, plaintiffs must allege facts supporting an inference that "a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States."  Morrow v. Balaski, 719 F.3d 160, 165-66 (3d Cir. 2013).  In evaluating a § 1983 claim, a court must first "identify the exact contours of the underlying right said to have been violated."  Id. at 166 (quoting Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (en banc)).  The court must then "determine whether the plaintiff has alleged a deprivation of a constitutional right at all."  Id.

The liability of a municipality—in this case, the District—under 42 U.S.C. § 1983 is governed by Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  Under Monell, a municipality cannot be subjected to liability solely because its agents or employees caused injury to another person.  Id.  Rather, a municipal entity may be liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" deprives a citizen of constitutional rights.  Id. at 694.  An official policy may be established under three circumstances: (1) the municipal entity adopted and promulgated a policy, the implementation of which caused the constitutional deprivation; (2) the policymaker failed to act affirmatively even though the need to take some action is obvious and the inadequacy of the existing practice is likely to result in the violation of constitutional rights; or (3) absent a formal policy, an official with policymaking authority violated federal law, causing the constitutional deprivation.  Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003).

In Counts I and III, Doan fails to state a claim under § 1983 because she has still not identified a constitutional right which the District may have violated.  With respect to I.D., his procedural due process right claim in Count II survives the motion to dismiss stage.  Each claim will be discussed in turn.

1.  **Count I—Plaintiff Kimberly Doan against Defendant Downingtown Area School District**

Doan alleges that the District violated her substantive due process right to control the educational upbringing of her child by insisting upon an individualized education plan that accounted for I.D.'s needs as a twice exceptional child with gifted and special needs.  (Am. Comp. ¶ 63.)  Doan argues that this right was violated by the District when it did not provide an education plan that properly fit I.D.'s needs and did not perform an evaluation prior to the issuance of the NOREP.  Id. at ¶ 64, 67.  The District counters that Doan has failed to allege the deprivation of a federal constitutional right.  (Mot. at 7.)

As discussed supra, § 1983 does not independently create substantive rights, but rather provides a remedy for violations of rights established elsewhere.  Thus, the court first must determine "whether the plaintiff has been deprived of a right secured by the Constitution and laws."  Baker v. McCollan, 443 U.S. 137, 140 (1979) (internal quotations omitted).  The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  Unlike procedural due process, substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them."  Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992) (citation and internal quotation marks omitted).  The substantive component of the Due Process Clause protects individual liberty and property interests from state conduct that is "arbitrary, or conscience shocking, in a

constitutional sense." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 (1998); Nicholas v.

Penn. State Univ., 227 F.3d 133, 139 (3d Cir. 2000).  It "provides heightened protection against

government interference with certain fundamental rights and liberty interests," which are held to

a more exacting standard of strict scrutiny.  Washington v. Glucksberg, 521 U.S. 702, 719

(1997).  "The conceptual essence of 'substantive' due process is the notion that

the Due Process Clause—in addition to setting procedural minima for deprivations of

life, liberty, or property—bars outright 'certain government actions regardless of the fairness of

the procedures used to implement them.'"  Brennan v. Stewart, 834 F.2d 1248, 1255 (5th Cir.

1988) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).  One form of

"substantive" due process is the substantive protections in the Bill of Rights that have been

"incorporated" into the Fourteenth Amendment to limit the power of the states.  See McDonald

v. City of Chicago, Ill., 561 U.S. 742, 791 (2010) (Scalia, J., concurring).  In addition,

"[a] liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the

word 'liberty,' or it may arise from an expectation or interest created by state laws or

policies."  Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (internal citations omitted).

Historically, the Glucksberg analysis has applied to the determination of whether a right is

fundamental.  That analysis requires "a careful description of the asserted

fundamental liberty interests," which must be "objectively, deeply rooted in this Nation's history

and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice

would exist if they were sacrificed."  Glucksberg, 521 U.S. at 720-21.

        The right to make child-rearing decisions is a substantive due process right under

the Fourteenth Amendment.  See Meyer v. Nebraska, 262 U.S. 390 (1923) (finding a statute

prohibiting foreign language instruction violated parents' rights); Pierce v. Society of Sisters,

268 U.S. 510 (1925) (upholding a due process right to send children to private schools).  As the

Pierce court explained,

> The fundamental theory of liberty upon which all government in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only.  The child is not the mere creature of the state those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and paper him for his additional obligations.

Pierce, 268 U.S. at 535.

"The Supreme Court has never been called upon to define the precise boundaries

of a parent's right to control a child's upbringing and education."  C.N. v. Ridgewood Bd. of

Educ., 430 F.3d 159, 182 (3d Cir. 2005).  While the Supreme Court has placed limitations on the

role of a school in dictating the upbringing of a child, see Wisconsin v. Yoder, 406 U.S. 205, 234

(1972) (holding that the free exercise of religion under the First Amendment outweighed the

State's interest in compelling school attendance beyond the eighth grade with respect to Amish

students), the right is not absolute.  See, e.g., Prince v. Massachusetts, 321 U.S. 158 (1944).  The

Third Circuit considers the right of parental autonomy to be "a limited one…[that] is neither

absolute nor unqualified."  Combs v. Homer-Center Sch. Dist., 540 F.3d 231, 247 (3d. Cir. 2008)

(quoting C.N., 430 F.3d at 182).

The state can interfere with parental rights in certain circumstances.  Prince, for

example, involved the state's authority to penalize child labor law violations, despite the parent's

insistence on engaging the child in various preaching activities.  The Court explained that the

liberty interest in the custody, care, and nurture of one's child resides "first" with the parents, but

it does not reside there exclusively, nor is it "beyond regulation by the state in the public

interest."  Id. at 166.  While the earlier Pierce decision recognized the profound importance of

family autonomy, that opinion also stated that "no question is raised concerning the power of the

state reasonably to regulate all schools, to inspect, supervise, and examine them, their teachers and pupils, to require that all children of proper age attend some school, that teachers shall be good moral character…."  Pierce, 268 U.S. at 534.

There are a number of cases where courts have upheld the constitutionality of school programs or policies that parents allege interfere with their right to dictate the upbringing of their child.  See, e.g., Leebaert v. Harrington, 332 F.3d 134 (2d Cir. 2003) (upholding school district's mandatory health classes against a father's claim of a violation of his fundamental rights); Parents United for Better Sch., Inc. v. Sch. Dist. of Philadelphia Bd. of Educ., 148 F.3d 260 (3d Cir. 1998) (upholding school district's consensual condom distribution program); Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525 (1st Cir. 1995) (upholding compulsory high school sex education assembly program); Citizens for Parental Rights v. San Mateo Cnty. Bd. of Educ., 51 Cal.App.3d 1, 124 Cal.Rptr. 68 (1975) (upholding school district's non-compulsory health and sex education program against parental challenge).  In particular, Brown discussed parental interference with school educational programs by stating the following:

> The Meyer and Pierce cases, we think, evince the principle that the state cannot prevent parents from choosing a specific educational program—whether it be religious instruction at a private school or instruction in a foreign language.  That is, the state does not have the power to "standardize its children" or "foster a homogenous people" by completely foreclosing the opportunity of individuals and groups to choose a different path of education.  We do not think, however, that this freedom encompasses a fundamental constitutional right to dictate the curriculum at the public school to which they have chosen to send their children.  We think it is fundamentally different for the state to say to a parent, "You can't teach your child German or send him to a parochial school," than for the parent to say to the state, "You can't teach my child subjects that are morally offensive to me."  The first instance involves the state proscribing parents from educating their children, while the second involves parents prescribing what the state shall teach their children.  If all parents had a fundamental constitutional right to dictate individually what the schools teach their children, the schools would be forced to cater a curriculum for each student whose parents had genuine moral disagreements with the school's choice of subject matter.  We cannot see that the Constitution imposes such a burden on state educational systems, and

accordingly find that the rights of parents as described by Meyer and Pierce do not encompass a broad-based right to restrict the flow of information in the public schools.

Brown, 68 F.3d at 533–34 (citations omitted) (emphasis added).  Further, the Ninth Circuit, in agreeing with the holding of Brown stated that "Meyer, Pierce, and their progeny 'evince the principle that the state cannot prevent parents from choosing a specific educational program,' but they do not afford parents a right to compel public schools to follow their own idiosyncratic views as to what information the schools may dispense."  Fields v. Palmdale Sch. Dist., 427 F.3d 1197, 1205-06 (9th Cir. 2005) (holding there is no parental due process violation after elementary school distributed survey regarding sexual matters to students).[4]

Here, Doan has not identified a fundamental right that she has been deprived of that is secured by the Constitution and laws.  See Baker v. McCollan, 443 U.S. 137, 140 (1979).  Doan cites to Meyer, Pierce, and Yoder as the genesis of the fundamental right, however, such cases do not support her assertion that she has a fundamental right to "control the education of her child" to the extent she claims.  See Am. Comp. ¶ 60.  While it is true that education is one aspect of a child's upbringing, the cases cited by plaintiff do not stand for the proposition that parents have total control over a child's education once the parents choose to send the child to public school.  Doan's asserted right cannot be classified as "fundamental".  In fact, most of the cases cited by Doan reject the claimed substantive due process violations, finding that the alleged substantive due process rights in upbringing their children are not considered "fundamental."  See, e.g., Leebeart, 332 F.3d 134 (discussed supra); Immediato v. Rye Neck Sch. Dist., 73 F.3d

---

[4]     A petition for rehearing en banc was filed by appellants to consider whether to rehear the matter nostra sponte.  The court denied not to do so and reaffirmed their decision filed on November 2, 2005.  See Fields v. Palmdale Sch. Dist. (PSD), 447 F.3d 1187, 1188 (9th Cir. 2006).

454, 461 (2d Cir. 1996) (holding School District's mandatory community service program for high school students did not violate parents' substantive due process rights in upbringing of their children); Blau v. Fort Thomas Pub. Sch. Dist., 401 F.3d 381, 393-95 (6th Cir. 2005) (holding parents of middle school student did not have a fundamental right to exempt his child from the school dress code).

In her Response, Doan does not articulate what right has been violated by the District, but rather, discusses the various frameworks courts use to evaluate an already recognized right. Doan asserts that she has the right to control the educational upbringing of her child by insisting upon an individualized education plan that accounted for I.D.'s needs as a twice exceptional child with gifted and special needs is fundamental, but then contradicts this proposition by stating that Doan's right should be evaluated under a rational basis analysis, which is the framework for evaluating a non-fundamental right. See, e.g., Jensen ex rel. C.J. v. Reeves, 45 F. Supp. 2d 1265 (D. Utah 1999) (discussing parent's objection to suspension of child from school). Then, while still failing to articulate a fundamental right and how it has been violated, Doan proceeds to discuss how the violation of her right could also be evaluated under a "shocks the conscience" framework. See Resp. at 8-9 (citing Luo v. Owen J. Roberts Sch. Dist., 2016 WL 6831122, at *24 (E.D. Pa. Oct. 27, 2016); Centennial Sch. Dist. v. S.D., 2011 WL 2441297, at *11 (E.D. Pa. June 17, 2011)). This court does not interpret any of the cases cited by plaintiff as recognizing a substantive due process right of a parent to control the educational upbringing of her child by insisting upon an individualized education plan that accounted for I.D.'s needs as a twice exceptional child with gifted and special needs.[5]

---

[5]     Furthermore, Doan asserts that her right was violated when the District did not perform an evaluation prior to the issuance of the NOREP and did not follow the order of the Hearing Officer. (Am. Comp. ¶ 64, 67.) The court notes that the performance of an evaluation pursuant

Accepting as true the factual allegations in plaintiffs' Amended Complaint, as the court must do in analyzing the present motion to dismiss, the court finds that Doan does not state a claim for relief in Count I.  That is, the facts alleged in the Amended Complaint are insufficient to show that Doan has a plausible claim for a substantive due process violation.  Accordingly, the District has met its burden of establishing that, based on the allegations in Count I of the Amended Complaint, Doan can prove no set of facts in support of her Section 1983 claim which would entitle her to relief.

### 2.    Count II—Plaintiff I.D. against Defendant Downingtown Area School District

As a preliminary matter, the District contends that plaintiffs' Amended Complaint goes beyond the court's order permitting amendment by adding I.D. as a plaintiff.[6]  (Mot. at 7.) Federal Rule of Civil Procedure 15(a) provides that a party may amend a pleading once as a matter of course before a responsive pleading is served.  Fed. R. Civ. P. 15(a).  Because a Rule 12(b) motion to dismiss is not considered a responsive pleading, plaintiff Doan was entitled to amend the complaint once as a matter of course without leave of the court.  See Community Country Day Sch. v. Erie  Sch. Dist., 618 F. App'x 89 (3d Cir. 2015) (not precedential) (discussing how Federal Rule of Civil Procedure 15(a) allows amendment of a complaint once as a matter of course and Rule 12(b) does not constitute a responsive pleading) (citing Shane v.

to a state administrative code and enforcement of an order is more accurately characterized as a procedural due process property interest violation with respect to I.D, rather than a parental liberty violation.  See n.10 infra.

6    Chief Judge Sánchez's July 31, 2019 order permitted plaintiff "to file an amended complaint correcting the pleading deficiencies identified in this Order."  See Doc. 12. Defendants assert that the court did not give leave to add I.D. as a party and add a new claim on behalf of I.D.  (Mot. at 7-8.)

Fauver, 213 F.3d 113, 115 (3d Cir. 2000) (same)).  The court finds that plaintiffs' Amended

Complaint would satisfy Rule 15 in this regard.

        With respect to the merits of this claim, the District avers that even if this claim

involved a federally protected right, I.D.'s procedural due process claim has not stated a cause of

action upon which relief can be granted.  (Mot. at 9.)

        To prevail on a "claim under § 1983 for deprivation of procedural due process

rights, a plaintiff must allege that (1) he was deprived of an individual interest that is

encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and

(2) the procedures available to him did not provide due process of law."  Hill v. Borough of

Kutztown, 455 F.3d 225, 234 (3d Cir. 2006) (internal quotation marks and citation omitted).  "In

evaluating a procedural due process claim, we first determine whether the asserted individual

interests are encompassed within the Fourteenth Amendment's protection of life, liberty, or

property."  Bakara v. McGreevey, 481 F.3d 187, 205 (3d Cir. 2007) (quotation marks and

citation omitted).

        Property interests are not created by the Constitution, but by independent sources,

such as state law.  See, e.g., Goss v. Lopez, 419 U.S. 565 (1975).  The Goss Court acknowledged

while there is no federal right to education, the Fourteenth Amendment forbids the State to

deprive any person of life, liberty, or property without due process of law.  Protected interests in

property are normally "'not created by the Constitution.  Rather, they are created and their

dimensions are defined' by an independent source such as state statutes or rules entitling the

citizen to certain benefits."  Board of Regents v. Roth, 408 U.S. 564, 577 (1972).  Thus, an

individual can be entitled to relief under federal law because of rights given by the respective

states.

Pennsylvania recognizes a right to a gifted education.  See Centennial Sch. Dist. v. Com., Dept. of Educ., 539 A.2d 785 (Pa. 1988) (holding that school district had obligations, pursuant to regulations promulgated by State Board of Education, to provide gifted student with individualized program of instruction which went beyond that provided by general "enrichment" program.); Cf. Student Roe by Roe v. Com. of Pa., 638 F. Supp. 929 (E.D. Pa. 1986) (assuming there is a property interest in gifted education for students with IQs of 130 or higher, there is no property interest when student's IQ does not fall within the specified range.").  In Pennsylvania, "Gifted Laws allow parents and school districts to settle disputes concerning a child's education plan through a number of procedural safeguards, including the filing of complaints and requests for due process hearings with the State educational agency."  Bethlehem Area Sch. Dist. v. Zhou, 2010 WL 2928005, at *1 (E.D. Pa. July 23, 2010).

Specifically, Chapter 16 of Title 22 of the Pennsylvania Administrative Code (the "Code") provides the framework for alteration of a GIEP and the procedure for which parents can challenge the effectiveness of a GIEP.  In discussing the requirements of a GIEP pursuant to the Code, the Pennsylvania Commonwealth Court in this case stated the following:

> Gifted education is defined as specially-designed instruction that is, *inter alia*, "[i]ndividualized to meet the educational needs of the [gifted] student" and "[r]easonably calculated to yield meaningful educational benefit and student progress." 22 Pa.C.S. § 16.1.  The term "specially-designed instruction" is further defined as "[a]daptations or modifications to the general curriculum, instruction, instructional environments, methods, materials or a specialized curriculum for students who are gifted."  Id. (emphasis added).  A gifted student's educational placement must:
>
> (1) Enable the provision of appropriate specially designed instruction based on the student's need and ability.
>
> (2) Ensure that the student is able to benefit meaningfully from the rate, level and manner of instruction.

(3) Provide opportunities to participate in acceleration or enrichment, or both, as appropriate for the student's needs.  These opportunities must go beyond the program that the student would receive as part of a general education.

22 Pa. Code § 16.41 (emphasis added).

These regulations require a placement be tailored to a student's individual gifted needs, including the instructional environment, methods and manner of instruction, see 22 Pa. Code §§ 16.1, 16.41, not just that the student receive special instruction in any form. In carrying out this mandate, a school district is required to provide an education sufficient to confer an educational benefit upon the student and it must be "tailored to the child's unique needs. ..." Daniel G. v. Delaware Valley School District, 813 A.2d 36, 42 (Pa. Cmwlth. 2002).

Downingtown Area Sch., 2017 WL 877316, at *6 (emphasis in original).

With respect to making alterations to a student's GIEP, the Commonwealth Court stated the following:

Revisions to GIEPs, changes in educational placement, or continuation of educational placement for a student determined to be a gifted student shall be made by the GIEP team based upon a review of the student's GIEP and instructional activities, present levels of educational performance, as well as on information in the most recent evaluation.

22 Pa. Code § 16.32(a).  In addition:

(a) Gifted students shall be reevaluated before a change in educational placement is recommended for the student.  In addition, gifted students may be reevaluated at any time under recommendation by the GIEP team.
...
(c) Reevaluations must include a review of the student's GIEP, a determination of which instructional activities have been successful, and recommendations for the revision of the GIEP.

22 Pa. Code § 16.23.

Id. at 6.

I.D. has alleged sufficient facts to identify property interests protected by the due process clause, including a property right to an appropriate gifted education as well as an

entitlement to an evaluation prior to the issuance of his NOREP.[7]  Having determined that I.D. maintained a legitimate entitlement to an appropriate gifted education, the question now becomes whether I.D. has alleged sufficient facts to support a claim that there has been a deprivation of that property interest without due process of law.

Generally, "the Constitution requires some kind of a hearing before the State deprives a person of liberty or property."  Id. (citations omitted).  Courts consider three factors to determine what process is required:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976) (citation omitted).

With respect to education specifically, the Goss court explained that "[b]y and large, public education in our Nation is committed to the control of state and local authorities" but also, that there are certain bench marks which must guide the Court's determination.  Goss, 419 U.S. at 574. "There can be no doubt" the Court noted, that at a minimum the "cryptic and abstract words of the Due Process Clause" require that a deprivation of life, liberty or property be preceded by notice and an opportunity to be heard.  Id. at 578–79

---

[7]     With respect to whether I.D. was entitled to an evaluation prior to an alteration of his GIEP, Hearing Officer Ford stated in his opinion that "[w]hen gifted education is working, a school may not substantively alter a student's GIEP (or the gifted portions of an IEP) without first evaluating the Student's needs in conformity with Chapter 16."  (Hearing Officer decision at 12.)  The Commonwealth Court also stated that "[s]tudent was required to be evaluated before the School District recommended a change in his gifted math educational placement for the 2016-2017 school year because a change from classroom-based instruction to primarily computer-based instruction is a change in instructional activities."  Downingtown Area Sch. Dist., 2017 WL 877316, at *6.

(citations omitted).  Additionally, the Court emphasized that "the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved.  The student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences." Id. at 579.

In the case at bar, the District avers that I.D. never used the process provided by the District to contest the appropriateness and quality of I.D.'s education during his fifth-grade year and to contest the substantive appropriateness of I.D.'s gifted educational program developed and provided by the District after, and in light of, Hearing Officer Ford's decision. (Mot. at 8-9.)

I.D. responds that he had a GIEP and IEP in place and never received an evaluation pursuant to Chapter 16.22 and Chapter 16.41(a) prior to the NOREP.  I.D. also argues that the District ignored Hearing Officer Ford's order as well as the order of the Commonwealth Court.  I.D. avers that neither he nor his mother had effective procedural mechanisms to compel the District's compliance with the Commonwealth Court order.  (Resp. at 13.)  Accepting as true all of the factual allegations contained in the Amended Complaint, the court finds that plaintiff, I.D. is able to state a claim for deprivation of a procedural due process property interest.  I.D. was entitled to a gifted education that fit his educational needs as well as an evaluation before the alteration of his GIEP.

With respect to the denial of plaintiff's property right to an appropriate gifted education generally, I.D. claims this right was violated beginning in March 2017 when the District failed to change the mode of education given to I.D. for sixth-grade math instruction,

despite the Commonwealth Court's decision affirming the findings of the Hearing Officer.[8]  I.D. alleges that the mode in which he received math instruction was not appropriate in that his academic performance suffered while he was unable to take his math class in the presence of his peers. (Amend. Comp. ¶ 50.)  While the mere violation of a state law is not equivalent to a due process violation, in certain circumstances, a due process violation may result from a failure to comply with a state court order.  See Ebmeier v. Stump, 70 F.3d 1012, 1013 (8th Cir. 1995).

Hearing Officer Ford's order indicated that computer learning with one-on-one instruction was not appropriate for I.D, and the Commonwealth Court affirmed this decision in March 2017.  I.D. remained in the same GIEP that was deemed inappropriate by the Commonwealth Court, pursuant to which he allegedly suffered academically and socially.  While a student is not entitled to a gifted education that makes the "best use of each student's abilities", he or she is entitled to an "appropriate education" under the regulations.  See Lisa H. v. State Bd. of Educ., 447 A.2d 669, 673 (Pa. Cmwth. 1982) (internal citation omitted); see also Bethlehem Area Sch. Dist., 2013 WL 1415843, at *1 (discussing that "[a]n IEP is appropriate if the data shows that the child is making progress based upon that plan").  Here, the Hearing Officer explicitly stated that the mode of education was "inappropriate."  Although the Hearing Officer's opinion was issued in August 2016, the District was not required to enforce the order while the appeal was pending.  I.D. alleges that once the Hearing Officer's order was affirmed in March of 2017, however, the District was required to give I.D. an appropriate GIEP.  While the District certainly complied with plaintiff's request (or plaintiff's mother's request) for due process

---

[8]    During oral argument, Chief Judge Sánchez questioned counsel for plaintiffs whether he had authority to support the proposition that the District was required to follow the Hearing Officer's order while the appeal was pending in Commonwealth Court.  Counsel responded that he could not answer the question "because there is no procedural regulation – regulations or process in place that explains that."  (N.T. 10/09/19 at 16.)

hearings, it is the alleged failure to comply with the Hearing Officer's order once affirmed by the Commonwealth Court that could constitute a procedural due process violation.

Lastly, as discussed supra, state law provides that plaintiff I.D. was entitled to an evaluation prior to the issuance of his NOREP. Plaintiff was not given an evaluation prior to his NOREP. Thus, plaintiff has presented a plausible claim that he was denied his property right to an evaluation before the issuance of his NOREP. The Third Circuit has made clear that in order to state a claim for a procedural due process violation, a plaintiff must attack the procedures used to reach the conclusion, not the result itself. Nicholas, 227 F.3d at 139 (citing Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 399 (3d Cir. 2000)).

Accepting as true the factual allegations in plaintiffs' Amended Complaint, as the court must do in analyzing the present motion to dismiss, the court finds that plaintiff states a plausible claim for relief. I.D. alleges that after the Commonwealth Court affirmed the order of Hearing Officer Ford, the District did not use its procedures to comply with the Commonwealth Court's order, or to properly evaluate I.D. before altering his GIEP. That is, the facts alleged in the Amended Complaint are sufficient to show that plaintiff I.D. has presented a plausible claim for a procedural due process violation.

### 3.   Count III—Plaintiff Kimberly Doan against Downingtown Area School District

In addition to claiming that the District violated her substantive due process rights by failing to perform an evaluation and provide I.D. with an appropriate gifted education, Doan asserts in Count III of the Amended Complaint that her procedural due process liberty rights were also violated by the District.

Again as stated with respect to Count II, to prevail on "a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of

an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide due process of law." Hill, 455 F.3d at 234 (internal quotation marks and citation omitted).  "In evaluating a procedural due process claim, we first determine whether the asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property." Baraka v. McGreevey, 481 F.3d 187, 205 (3d Cir. 2007) (quotation marks and citation omitted).  It is well settled that "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property" and that the range of interests so protected "is not infinite." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564 at 569-70 (1972).

Here, as discussed with respect to Count I, plaintiff has failed to provide any support in case law for her theory that she has a Constitutionally protected right to control the educational upbringing of her child by insisting upon an individualized education plan that accounted for I.D.'s needs as a twice exceptional child with gifted and special needs.  Doan does not have a federally protected right to dictate an individualized educational plan that accounted for I.D.'s needs.  (Am. Compl. ¶ 63.)  Further plaintiff has failed to set forth a plausible claim that her procedural due process rights were violated when the District failed to perform an evaluation of I.D. pursuant to a state administrative code and failed to enforce a Hearing Officer's decision as directed by the Commonwealth Court.[9]

---

[9]     As discussed supra, protected interests in property are normally "'not created by the Constitution.  Rather, they are created and their dimensions are defined' by an independent source such as state statutes or rules entitling the citizen to certain benefits." Board of Regents v. Roth, 408 U.S. 564, 577 (1972).  Even assuming that Doan argued that she was deprived a property interest, rather than a liberty interest, it would be inaccurate to state that an evaluation which is required to be given prior to the issuance of a NOREP is a property interest that a parent is "entitled" to receive.

Doan's allegations do not implicate a constitutionally protected liberty interest sufficient to support a procedural due process claim. Accepting as true the factual allegations in plaintiff's Amended Complaint with respect to Count III, the court finds that plaintiff does not state a claim for relief. That is, the facts alleged in Count III of the Amended Complaint are insufficient to show that the Doan has a plausible claim for a procedural due process violation.

### B.    Count IV- Plaintiff Kimberly Doan against Larry Mussoline for Abuse of Legal Process

In Count IV of the Amended Complaint, plaintiff Doan presents a claim against defendant Larry Mussoline for abuse of legal process. However, defendant Mussoline argues that plaintiff Doan has not properly pled a claim for abuse of legal process under Pennsylvania law. (Mot. at 11-12.)

In order to state a claim for abuse of process, plaintiff must allege that defendant: (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designated, and (3) harm had been caused to the plaintiff. Langman v. Keystone Nazareth Bank & Trust Co., 502 F. App'x 220, 224 (3d Cir. 2012) (not precedential) (citing Lerner v. Lerne, 954 A.2d 1229, 1238 (Pa. Super. Ct. 2008); see also General Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297 (3d Cir. 2003). "The essence of an abuse of process claim is that proceedings are used for a purpose not intended by the law." Cameron v. Graphic Mgmt. Assoc., Inc., 817 F. Supp. 19, 21 (E.D. Pa. 1992) (Cahn, J.). As such, "there is no cause of action for abuse of process if the claimant, even with bad intentions, merely carries out the process to its authorized conclusion." Id. A plausible cause of action for abuse of process "usually pertains to situations involving 'extortion by means of attachment, execution or garnishment, and blackmail by means of arrest or criminal prosecution.'" Id. (quoting Zappala v. Hub Foods, Inc., 683 F. Supp. 127, 129 (W.D. Pa. 1988)).

Doan alleges that Mussoline abused the legal process by appealing the Hearing Officer's decision to the Commonwealth Court primarily for the purpose of delaying the need to implement an education plan in accordance with the Hearing Officer's decision, in order to avoid incurring further expense to the District.  (Am. Comp. ¶ 100.)

Mussoline counters that filing an appeal "to contest an adverse decision is hardly a perversion of process primarily to accomplish something other than reversing Hearing Officer Ford."  (Mot. at 11.)  Relying on General Refractories Co. v. Ins. Co. of North Am., 906 A.2d 610 (Pa. Super. Ct. 2006), Mussoline argues that the delay experienced in the proceedings was not perversion, but rather a "natural consequence of ordered due process."  Id. at 11.

Plaintiff Doan's abuse of process claim is premised on the fact that defendant filed an appeal after the Hearing Officer decided that the online classes constituted a change of placements.  In order to establish this claim, plaintiff must show (1) that Mussoline's appeal to Hearing Officer Ford's decision constituted the use of a legal process, (2) that the primary purpose for which Mussoline appealed the decision was not for the purpose for which appeals are intended, and (3) that the day resulting from the appeal harmed the plaintiff.  See Rosen v. American Bank of Rolla, 627 A.2d 190, 192 (Pa. Super. Ct. 1993).  The material facts set forth in plaintiffs' Amended Complaint, when read in conjunction with the applicable law, do not support a cause of action for abuse of process.

Here, the facts alleged in the Amended Complaint fail to establish that the process was used primarily for a purpose for which the process was not designed.  See McGee v. Feege, 535 A.2d 1020, 1023 (Pa. 1987); Rosen, 627 A.2d at 192; Rosen v. Tesoro Petroleum Corporation, 582 A.2d 27, 32 (Pa. Super. Ct. 1990).  It is not enough that the process was perhaps employed with a collateral purpose in mind, but rather a cause of action for abuse of

23

process requires "[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of process …[;] there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intention." Lerner v. Lerner, 954 A.2d 1229, 1238 (Pa. Super. Ct. 2008) (citing Shiner v. Mortiarty, 706 A.2d 1228, 1236 (Pa. Super. Ct. 1998), appeal denied, 556 Pa. 711, 729 A.2d 1130 (1998)).

Doan has failed to allege that Mussoline did anything more than carry out the process of appealing Hearing Officer Ford's order, even if in appealing the Hearing Officer's order he wished to delay enforcement of the order. The allegations described above are insufficient to support an abuse of process claim. Plaintiff has not alleged facts that show that defendant used the appeal process for any purpose other than that intended by law. Therefore, Doan has not stated a cause of action for abuse of process against Mussoline and Count IV of the Amended Complaint will be dismissed.

## IV.        Conclusion

For the foregoing reasons, the court finds that defendants' Motion (Doc. 14), will be **GRANTED** as to Claims I, III, and IV and **DENIED** as to Claim II. An appropriate order follows.

BY THE COURT:

_s/ Thomas J. Rueter_
THOMAS J. RUETER
United States Magistrate Judge

24